This is Rossi v. Chicago Mr. Cantwell Good morning. It's great to be here and especially to see Judge Easterbrook, Judge Mannion, Judge Williams. May it please the court, I'm Peter Cantwell along with John Kalich who's here to assist me. And I'm deeply grateful for this opportunity to address this panel. Forty years ago, I was admitted to practice this year. And during that time, I've come to understand the very great importance of both our appellate courts and our juries in protecting the rights, the constitutional rights, including the right to redress that everyone is to have under our Constitution. And this is one of those situations, sadly, where for a number of different reasons, the trial court failed to see the importance and recognize the importance of the questions of fact that are squarely there. Not just OBRCA, which we did not cite for collateral estoppel in any way, shape, or form. We cite that case because it is evidence that there is a question of fact that needs to be decided. Not just at the summary judgment stage in OBRCA, which granted no relief at summary judgment, or in the case to trial. But in this situation, we have an utter misunderstanding of the underlying facts in this case. And really an effort to trivialize the importance of some of those. The city claims that we have no complaint of here at all because Mr. Rossi was present for the entire incident, the entire beating. I don't know how anybody could be held accountable for giving, rendering a factual understanding of what happened during that incredible amount of time. But in this situation, after six hours of intense beating, and after everyone else sort of fell asleep at 3 o'clock in the morning, he managed to chew through his restraints and get loose. And I would submit that, but for the cover-up that occurred here, there's no question in the world that that crime scene was anything but a hotbed of all kinds of evidence laying there. Not just the individual perpetrators, but also the blood, the DNA, the tissue, all the things, the weapon, tape recorder, all the things that could have been recovered if anybody had just done some of the basic things that should have been done with any crime scene. It should have been secured. Well, counsel, given the holding of DeShaney, where is there any obligation to investigate crimes? Since there's no obligation to protect people against crime, why is there an obligation to investigate crimes? Because that's what we pay our police department to do. No, no, no, no, no, no. You have to answer a question about the Supreme Court's decision in DeShaney by addressing the significance of DeShaney. Well, I think the problem with the decision in DeShaney, which we all must live with... You can't discuss problems with the decision in DeShaney. We have no authority to question it. We're here to apply it. You have to tell us why your theory is compatible with the holding of DeShaney that there is no entitlement to protection from crime. We all have to recognize there's no protection from where it happens. The case you just heard is riddled with crime. This is your opportunity to address DeShaney. I think what we have here is an intentional... I'm not asking what we have here. I am asking about the legal significance of DeShaney. The significance of DeShaney, as I understand it, is that the police does not have an obligation to protect people. That does not mean that when they do their job that they can ignore their duties and responsibilities in completing their proper investigation. No, that's exactly what DeShaney holds. DeShaney holds that as a matter of federal constitutional law, you have no right to protection. And you have no right to have the police follow whatever their obligations are under state law. If they have obligations under state law, you have a claim under state law. Now, that's mostly what your brief sounds like. Your brief sounds like there is a claim under state law, but the U.S. Constitution in 1983 don't enforce state law. So I wonder why you haven't sued in state court under state law. You ask a good question. I will have to think about that one. I don't know the answer as to the ability to address it with state law. What I do know is that in this situation, evidence was destroyed. It was ignored. And the cover-up contributed dramatically to that, leading to at least two individuals that completely got away. Well, let's move to your Monell claim, because you have a Monell claim. And I haven't seen any evidence in the record of a widespread customer practice that deprived Rossi of his constitutional rights. I think you can find that evidence by looking at the mere fact that someone would be so brazen, a police officer would be so brazen, to know that there is not going to be any discipline imposed for his willful cover-up, for his deception, for ignoring the plain fact that Mr. Garcia was married to Officer Catherine Dubik. So what is the customer practice? I mean, what evidence is there? Who testified that this was routinely done when a police officer might be involved in a crime or a cover-up, that it would be ignored? I mean, it just can't be that officer's belief. That's not enough for Monell. Well, we have – I think that Obreka is a very important case, as are some of the other cases that we cite along that same line of cases, because the police in the city of Chicago know that there is no training, no accountability, until after 2006, 2011. There was no ethics training. There was no requirement that they measure up to the kinds of standards of integrity that we would hope our police officers would have to measure. And there was no enforcement. In fact, the Office of Professional Standards was eventually abolished not long after these incidents, and Obreka and Rossi happened within months of each other. And we now have IPRA, the Independent Police Review Authority, that governs and watches police conduct. So given that state of affairs at that time, I think there is enough judicial notice that we can take and must take that this was a common, widespread practice. Well, the Obreka expert reports were not included in the Rule 26a disclosures or in the answers to interrogatories or anything, right? We didn't get that far. We never really completed Monell's discovery. The first time they were included was in response to summary judgment in the 56th. They filed a motion for summary judgment before, we believe, we had an opportunity to develop the Monell side of this case. And we did not. It's all there. We can certainly take notice of what the reports were that were filed and presented as evidence within Obreka and have been well-published in the law reviews and elsewhere. It's well-known. It's common knowledge in the city of Chicago that less than 1% of the Chicago Police Department has ever subjected to any sort of discipline. We have a union contract that now allows every police officer basically to get a clean record after seven years. They expunge everything off the record. There is so little accountability that the police officers know that they can pretty much do what they want to do. They're not going to be held accountable for what they've done. Excuse me. What about Dubnyk? She settled, we don't know for how much. The judge took into consideration the fact that he'd gotten $80,000 in settlements, which based on the way he's described, that's probably not very much by comparison. But she settled for something, and there must be admissions in all of that. And that's what I know these last two, you stretch away and they sort of, I don't know what you want to say, just didn't pursue it, didn't come back, didn't come back for more inquiry and that sort of thing. The thing that it's, I can understand the irritation, but what more is mandated, frankly? Somebody has confessed and paid money. We were placed in a situation where we had an extraordinarily difficult time proving this case. The reason is, as in the record it's shown, that we amended our complaint to include individuals named Malgoza and Foster, or Oscar Malgoza and Mike Foster, is because those were the false answers we got from our discovery responses from these very same defendants who were then hiding behind the Fifth Amendment. So we have a situation where it was the corporate, and I think it may be known, but the defense that was tendered on behalf of Garlic Trucking was a corporate defense. And to even obtain anything by way of settlement from them, it's basically insurance company money. No one actually put up any money out of their pocket, and the insurance company did, except Dubik. She did come up with some money. Where that came from, we don't know that either. But we were left with a situation where we have a man who has permanent disfigurement, who lost a tooth because of a gun butt hitting him in the face. We had no ability to prove that. There was a tape recording that was being made. That was lost. We had all kinds of evidence that would have certainly led to locating, I think, if someone had come. If a proper investigation had been done immediately, we might have even found the perpetrator still sleeping on the premises, who were drinking and having a wonderful time and consuming drugs as they were beating Mr. Rossi with an inch of his life. And he has permanent vision problems because of that beating, because of the damage that was done to his orbital eye sockets. This was a brutal, brutal beating, and I don't know if you've seen the photos, but they're in the record of his condition. A five-minute interview and a quick whitewash. Just walk away from this whole thing. Ignore it. And even though he knew, I'm talking Detective Matthews knew within literally three days exactly who Catherine Dubik was, and even though the city of Chicago has a policy that prohibits police officers, as a matter of rigid rules, from getting involved with felons, and that's then reviewed on a case-by-case basis, none of those things were ever brought to light. And Catherine Dubik was not interviewed until over three and a half years after the incident occurred by anybody from Internal Affairs, by anybody from the Chicago Police Department. It really wasn't until Dave Cervini from Channel 2 News broke the story almost six months later that finally people started taking some action. But by then, as the record shows, the carpet had been replaced, the whole place had been cleaned up. I'm sure all the city makes a big thing about rope and extension cords and things like that are common tools found within construction sites. Those common tools would not have had blood on them, which they would have that night, or even within the next day perhaps. They would not have had DNA on them. There was tape that had, I'm sure, human tissue and hair and things like that. It was an amazing scene, as it's been described to me, that occurred there. So these two individuals walked away altogether. This evidence, in effect, was allowed to be destroyed, and that's something that should not have ever happened. That is the kind of, and I do agree with Judge Easterbrook, that to some extent that would also be a state claim. But it was all being done under color state law with a police officer with a police radio, a squad car aiding and abetting this entire thing and intimidating the heck out of Mr. Rossi as he's looking at potential body bags and saws that are there to literally cut up his body parts after they dispose of him. So a chainsaw is a pretty intimidating thing. This was an awful, awful experience. So even though some people say, gee, that's a lot of money, you couldn't pay me $8 million to go through what he went through and that he'll live with the rest of his life as he continues to hide out of state, gave up his Chicago connections, lives elsewhere because he lives in fear day to day. That's not what we want our people, that's not what we want our citizens to be experiencing here. So I think these are very serious allegations. There are enough questions of fact here that have to be addressed by a jury. And to grant summary judgment when there are so many questions of fact is just contrary to the rule of law, which is why we come before this court. We're asking for your assistance in ensuring that we do get that day in court in front of a jury so these questions of facts can be addressed. Going back to the point that I was asked about with the shame, we don't have a right to be free from crime. I think we all understand that there's nothing we can do to protect ourselves from every sort of crime that there might be. I would like to reserve a few minutes for rebuttal, and so I see my yellow lights on, but I do want to answer every question that the panel has. That's how much you have left. Pardon? That's how much you have left. I asked for five minutes for rebuttal. Yes, and the white light went on at five minutes. You have about 15 seconds. Okay, I will say 15 seconds. Thank you. Mr. Light. Ms. Light. Sorry. May it please the Court. Your Honors, Mr. Rossi has already recovered on state law claims against the people who were responsible for his beating and kidnapping, which were the Garla defendants and Ms. Dubeck. There is no basis for any of his remaining claims against the city defendants, who are Detective Matthews and the City of Chicago. This morning, I intend to focus my remarks on two of Mr. Rossi's claims, the denial of judicial access claim against Detective Matthews and the Monell claim against the city, and with respect to the remaining claims would rest on our brief, unless the Court has specific questions. I just have a question. Did the district court ever provide any explanation for rejecting his objections to the bill of costs? There was nothing that the district court put in writing that's in the record. No, Your Honor, no. So we don't have any explanation? We don't have any explanation, but what we do know regarding costs is that the objections that Mr. Rossi put forth were clearly frivolous under the law of the circuit. Each one of those objections, there's a case on point that directly rejected it, and accordingly, it would have been an abuse of the district court's discretion if the district court had denied costs. And most egregious is Mr. Rossi's claim that because he was indigent, that he should not have had to pay costs, because this court has squarely held in the Rivera case that it is an abuse of the district court's discretion to deny costs when, as here, the person that would have to pay costs doesn't put forward a single piece of documentary evidence to support the claim of indigence. So because Mr. Rossi didn't have any evidence that he was, in fact, indigent, that he submitted, the district court would have abused its discretion to deny costs in that circumstance. The other objections are equally weak for the reasons that we explain in our brief, which I'm happy to address if Your Honor would like me to. One other point about that, Your Honor, the district court, in addition to knowing what the cases hold about costs, was aware that Mr. Rossi had access to the settlement with the other defendants, the $80,000 from the Garla defendants and an undisclosed amount from Dubac. So in light of that fact, it also would have abused its discretion by denying costs when plainly Mr. Rossi was not indigent within the meaning of the cases. Turning to the denial of judicial access claim, there are two necessary requirements for a successful denial of access claim that are not present in this case. The first is that there is something unknown to the plaintiff about the true facts undergirding the cause of action that the officer knows but keeps from the plaintiff. And two, that this actually prevents or impedes the plaintiff's ability to pursue the underlying claim. In other words, denial of access requires covering up the true facts in a way that impacts the state law action or whatever other underlying cause of action there might be. In this circuit, Bell is the only decision where both of those elements were satisfied and there was a successful denial of access claim. Said the other way, there is no denial of judicial access claim where the plaintiff knows just as much, if not more, about the facts of the case supporting the claim than the defendant officer and also has a state law remedy available. So in this court's decisions in the Cefalu, the Thompson, and the Cannon matter, the plaintiff knew just as much as the defendant officer because the plaintiff and the officer were face-to-face participants in the incident, and this court held there was no denial of judicial access because state law remedies were available. And in Vasquez, this court held that although there was a fact that the defendant officer knew that the plaintiffs did not, because the plaintiffs learned those facts in time to pursue their state law remedies, there was no denial of access claim. What state law remedies would be available because after he escapes and then there's a crime scene that's got all kinds of clutter around it that nobody went and did anything about that. What could he have done besides tell Matthews? Well, Your Honor, in that situation, he could have hired a private investigator is one thing that he could have done. He could have, as he did, pursue his state law claims against the Garland defendants and through discovery, attempt to obtain the information that he needed. He actually, it should not be forgotten, succeeded on his state law claims in this case. Nothing that Detective Matthews did impeded his ability to file suit on those claims and actually succeed on those claims. And, Your Honor, there is simply no constitutional duty on the part of law enforcement officers to go to a crime scene and collect evidence on behalf of a plaintiff so that a plaintiff can pursue a civil lawsuit. That's the holding of DeShaney. That's the holding in many other of this court's cases and many other circuits as well. In the Cefalu case, this court held there was no denial of judicial access because the plaintiff had access to state law remedies and knew all the facts. Even though the plaintiff had alleged, the police should have done a better job investigating. So, in other words, this court does not think that there's a constitutional obligation on the part of police to investigate or investigate in any sufficient way. So the state, whatever it would be, if he reports to all of this and there's a crime scene, I don't know how much time he's in the hospital, right? Correct, Your Honor. So obviously he's beat up and all that. I guess what would normally happen is somebody would find out if there are criminals out there that should be, I guess, charged or something. And that's what they didn't do. And I think, well, he could have got a private investigator. I'm not talking just about the civil case. I'm just looking at whatever crime was reported and what he could have done to overcome the not reporting. Well, Your Honor, there is no constitutional right on the part of anyone to have crime solved on their behalf. And we cite the Sattler case from the Fourth Circuit for that proposition. In that case, there was a tavern fire. There was supposedly arson. And the plaintiff alleged that against the defendant officers, they should have done a better job figuring out who was responsible and providing the plaintiff with information for the civil action. But in addition, prosecuting those people that were responsible criminally. But the Fourth Circuit in that decision held there is no such constitutional right on the part of anyone to have another person investigated or prosecuted or to have a crime scene secured and to have evidence turned over. The nature of the denial of access constitutional right is simply that where the police already know something and they keep that from the plaintiff who does not know that. And because of that, the plaintiff doesn't have the opportunity to go to court based on that true set of facts. That's what violates the Constitution. It's not an affirmative duty to go out and solve crimes. It's you can't tamper with evidence when you know something that the plaintiff doesn't. That was the Bell decision, where the knife was planted in the decedent's hands to make it look like a different situation than what were the true facts. So then they know the perpetrators or at least the names of some of them. There's no duty to follow up on that. There's no duty on the part of the police to follow up or figure out who was responsible for those crimes. And yes, Mr. Rossi knew. He knew all those people because he worked with them. He knew the true facts because he knew what happened to him. He knew who was responsible, and he had his own testimony and his own best evidence, and he was able to pursue his state law remedy against those defendants based on those true facts. That's all that the judicial access requires. He was successfully able to do that. Detective Matthews did not have the obligation under the Constitution to figure out who the real Oscar and Mike were, to go to the crime scene and secure evidence on Mr. Rossi's behalf. There's simply no duty on the part of police to take those steps. The Eleventh Circuit's decision in the Chappelle case and the Cunningham case also support this notion that there is no obligation to help the plaintiff with evidence because in those cases the court held there's no denial of judicial access where the plaintiff has the ability to go and pursue state law claims, even though the police in that case had evidence within their possession that they kept from the plaintiffs that would have helped support the lawsuit. It did not matter to the Eleventh Circuit that there was evidence that might have helped bolster their claims that was hidden under the desk chair pad in one of the officer's offices. The Eleventh Circuit said, No, that's not what denial of judicial access is about. It's about if you know the facts and you can go to court to pursue your claims, the police don't have the duty to turn over evidence. Now we don't have even that situation in our case because there was no evidence in Detective Matthews' possession. Mr. Rossi's claim is even weaker because he's alleging not that there was evidence that Mr. Detective Matthews kept from the plaintiff, but instead that he just didn't go out and find the evidence. So moving on to the Monell claim, unless there are further questions regarding judicial access, Mr. Rossi just does not have any evidence that is sufficient to support whether the city had a widespread customer practice that he alleges, which is the code of silence. And before I address that, I just want to urge this court to enforce Mr. Rossi's waiver. In his opening brief, he focused solely on the code of silence and he relied solely on the Olbrichka decision and the decisions in Myatt and Ambrose. He did not actually point this court or make any argument regarding the other under-supposed widespread practices that he came up here this morning to address or that he tried to point to in his reply brief. And he also did not mention anything about the policy regarding felons or really any of the evidence he was talking about this morning, supposedly the 1% discipline rate, the lack of training, all those things. None of that was in his opening brief, and we urge the court to enforce the waiver and not allow him to come up with those at oral argument. Regarding the Olbrichka decision, the reason that judicial notice is inappropriate is because this court has held that it's not appropriate to take judicial notice of findings in a different lawsuit where the requirements of collateral estoppel are not met. So that was this court's decision in the General Electric case. If a court could take judicial notice of a fact simply because it was found to be true in a previous action, then the doctrine of collateral estoppel would be superfluous. And in this case, Mr. Rossi agrees that collateral estoppel is not appropriate with respect to Olbrichka. And because collateral estoppel is not appropriate, therefore judicial notice is not appropriate either. The Olbrichka plaintiff was able to get to a jury and convince a jury based on evidence she presented that it's up to the plaintiff in each lawsuit to submit his own evidence to support his claim. He can't simply point to the fact that another plaintiff succeeded in a different lawsuit as evidence to get to a jury. That's not appropriate for the jury to consider. And for that same reason, Mr. Rossi can't rely on what the judges in Ambrose and Myatt said because that's not evidence that could go to the jury either. Those are statements that were made decades ago in other cases that it's not evidence that he himself can point to. And finally, with respect to Mr. Rossi's argument that there would have been other evidence that he could have found if only Modell Discovery had proceeded more to his liking, he has never made that claim in this litigation. And again, we urge the court to enforce that waiver if that was a complaint he had, then he should have raised that in the district court and then he should have raised that here on appeal in this case as well. Unless this court has any further questions regarding Modell or the judicial access claim or any of the other claims, we would respectfully ask this court to affirm the district court's judgment. Thank you, Your Honors. Thank you, Ms. Layton. Anything further, Mr. Cantwell? Just briefly. That's assured. Thank you. With respect to Ms. Cheney, the Third Circuit in Horton is very specific about not only finding a Monell claim there but distinguishing the fact that that was not a police action case. This is a police action case. As to his knowledge of ours is. It's what they didn't do. It's the destruction of evidence. Thank you very much, Counsel. Thank you. It's great to see you. The case will be taken under advisement.